IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DOUBLE R RANCH TRUST**, 18745 Highway 62, Eagle Point, OR 97524; **OREGON CATTLEMEN'S ASSOCIATION**, 1320 Capitol Street NE, Salem, OR 97301; **OREGON CONCRETE AND AGGREGATE PRODUCERS ASSOCIATION**, 373 SE 13th Street, Salem, OR 97301,  Plaintiffs,  v.  **KRISTIN BAIL**, Acting Director, Bureau of Land Management, 1849 C Street NW, Washington, D.C. 20240, and **KEVIN "JACK" HAUGRUD**, Acting Secretary of the Interior, 1849 C Street NW, Washington, D.C. 20240,  Defendants. | Civil No.  Action for Declaratory and Injunctive Relief to Remedy Violations of the Wild and Scenic Rivers Act of 1968, 16 U.S.C. § 1271–1287; and the Administrative Procedure Act, 5 U.S.C. §§ 551–706 |

## COMPLAINT

For its complaint against defendants Kristin Bail, Acting Director of the Bureau of Land Management ("BLM"), and Hon. Kevin "Jack" Haugrud, Acting Secretary of the Interior (the "Secretary"), plaintiffs allege as follows:

### INTRODUCTION

1.      This action for declaratory and injunctive relief arises from the BLM's determination that a portion of Oregon's Rogue River is eligible and suitable for designation under the Wild and Scenic Rivers ("WSR") Act of 1968, 16 U.S.C. §§ 1271 to 1287, a

determination that violates the Act's requirements, including Section 2, 16 U.S.C. § 1273(b) (eligibility), and Section 16, 16 U.S.C. § 1286(b) (definition of "free-flowing").

2.  On August 5, 2016, BLM signed Records of Decision approving Resource Management Plans ("2016 RMPs") for Western Oregon. The 2016 RMPs affect resource management in the Coos Bay, Eugene, Medford, Roseburg, and Salem Districts, as well as the Klamath Falls Field Office of the Lakeview District. In the Medford District, a 63.5-mile segment of the Rogue River, from river mile 95 to river mile 157.5, is protectively managed as eligible for designation under the WSR Act (the "Proposed Segment"). The 2016 RMPs include a determination that the Proposed Segment is suitable, as well as eligible, for inclusion in the WSR program. Accordingly, BLM and the Secretary will recommend congressional action to designate the Proposed Segment. Such action contravenes the purpose of the WSR Act and would violate its express provisions.

## JURISDICTION AND VENUE

3.  The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief). Plaintiffs have challenged final agency action as defined by the Administrative Procedure Act, 5 U.S.C. § 704. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is an action against United States agencies and officials, because a substantial part of the events and omissions giving rise to the claims in this case occurred in this District, and because defendants Bail and Haugrud reside in this District.

## PARTIES

### Plaintiff Double R Ranch Trust

4.  Plaintiff Double R Ranch Trust (the "Ranch") owns the Double R Ranch, located in Eagle Point, Oregon. The ranch property comprises more than 1,000 acres along and abutting both sides of the Rogue River, from approximately river mile 140.5 to 145.5. In this reach of the

Page 2 – **COMPLAINT**

Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 327
Portland, Oregon 97219
Telephone:  (503) 768-8500
Fax:  (503) 222-3255

Rogue River, which is within the Proposed Segment, the river has a history of extreme flood events, and the river channel is subject to erosion and migration. The Double R Ranch Trust, along with other ranch owners and their predecessors in interest, have invested thousands of dollars to stabilize, re-contour, and engineer the river banks to prevent loss of valuable uplands. Because of the volatile and torrential character of the river in this reach, the ranch owners must engage in similar activities in the future, or risk the loss of forest and agricultural lands and the degradation of fisheries and fish habitat.

5.      The streambank stabilization projects at Double R Ranch required permits, including a permit from the United States Army Corps of Engineers ("Army Corps") under Section 404 of the Clean Water Act, 33 U.S.C. § 1344. Under current protective management, and following designation, the Army Corps will be prohibited from issuing any further Section 404 permits for streambank stabilization. *See* 16 U.S.C. § 1278(a); *see also* U.S. Department of the Interior, Bureau of Land Management, *Medford District Record of Decision and Resource Management Plan* at 68, 223, 241-242 (June 1995) ("1995 Medford District RMP") (eligible rivers managed to "protect a segments' free-flowing values"); Bureau of Land Management, *Southwestern Oregon Record of Decision and Approved Resource Management Plan* at 53 (August 2016) ("2016 Southwestern Oregon RMP") (eligible, suitable, and designated segments managed to "protect and enhance the free-flowing condition"). Current protective management, and inclusion of the Proposed Segment in the WSR System, will cause immediate and direct harm to the Ranch by preventing the Ranch from securing a Section 404 permit in order to further protect its property from erosion and channel migration.

6.      At least eight water rights for primary and supplemental irrigation from the Rogue River are appurtenant to the Double R Ranch property. Several of the Ranch's water rights have been changed, in accordance with state law, to alter their place of use, or point of diversion, or both. The Ranch's ability to make further changes to existing water rights, and its ability to apply

Page 3 – **COMPLAINT**

Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 327
Portland, Oregon 97219
Telephone:  (503) 768-8500
Fax:  (503) 222-3255

for new water rights from the Rogue River, will be curtailed by designation of the Proposed Segment, and will likely be limited under current protective management. *See* U.S. Department of the Interior, Bureau of Land Management, *Wild & Scenic Rivers Suitability Report — Southwest Oregon* at 127 (April 2007) ("*Suitability Report*").

7. The declaratory and injunctive relief requested by plaintiffs will redress these harms by declaring that the Proposed Segment is ineligible for inclusion in the WSR System and by removing it from protective management. The Army Corps would not be prohibited from issuing a permit and the Ranch could secure authorization under Section 404 for streambank stabilization necessary to protect Ranch property, fisheries, and fish habitat. The Ranch could change the points of diversion of places of use for its existing water rights from the Rogue River, and could secure new water rights, as necessary for irrigation on the Ranch.

**Plaintiff Oregon Cattlemen's Association**

8. Plaintiff Oregon Cattlemen's Association ("OCA") is a nonprofit trade association that has represented the interests of Oregon cattle producers since 1913. OCA advocates for the needs of about 13,000 cattle producers, including the Double R Ranch and other ranchers and farmers in the Rogue River valley, within the Proposed Segment. OCA members, including Owens Round Cattle, LLC, hold federal grazing permits that will be affected by the inclusion of the Proposed Segment in the WSR System.

9. Current protective management, and inclusion of the Proposed Segment in the WSR System, will cause immediate and direct harm to OCA members by preventing farmers and ranchers from securing permits under Section 404 of the Clean Water Act to protect their riparian property from erosion and channel migration; and by imposing restrictions on vegetation management, livestock grazing, and water diversions for irrigation and livestock watering. *See* "BLM Manual 6400 – Wild and Scenic Rivers – Policy and Program Direction for Identification, Evaluation, Planning, and Management §§ 3-12, 3-14 (July 13, 2012) ("*BLM Manual*").

Page 4 – **COMPLAINT**

10. Adding the Proposed Segment to the WSR System will also cause immediate and direct harm to OCA as an organization because the WSR designation impairs OCA's ability to fulfill its mission to improve and strengthen the economics of the livestock industry and to protect the communities and private property rights of livestock producers throughout Oregon.

11. The declaratory and injunctive relief requested by plaintiffs will redress that harm by declaring that the Proposed Segment is ineligible for inclusion in the WSR System and by removing it from protective management. The Army Corps would not be prohibited from issuing a permit and OCA members could secure authorization under Section 404 for streambank stabilization necessary to protect private property. In addition, OCA members would remain free to maintain control over vegetation management, livestock grazing, and water diversions.

**Plaintiff Oregon Concrete and Aggregate Producers Association**

12. The Oregon Concrete and Aggregate Producers Association ("OCAPA") is a trade association that advocates for the interests of aggregate and ready-mixed concrete producers, associate suppliers, and industry-related service providers. The Proposed Segment is currently used and has been used historically for aggregate production. To prevent severe environmental degradation, many historical mining sites in the Proposed Segment must be managed through streambank modification and stabilization. Current protective management, and inclusion of the Proposed Segment in the WSR System, will cause immediate and direct harm to OCAPA members by preventing them from securing permits under Section 404 of the Clean Water Act, which are necessary to further protect historical mining sites from erosion, channel migration, and channel "capture" of excavated gravel ponds.

13. In addition, current protective management, and inclusion of the Proposed Segment in the WSR System, will cause immediate and direct harm to OCAPA members by closing the Proposed Segment to salable mineral material disposal. *See* 2016 Southwestern Oregon RMP at 105. On private property, OCAPA members will face opposition from BLM, a

Page 5 – **COMPLAINT**

commenting agency, when they seek an operating permit from the Oregon Department of Geology and Mineral Industries for activities on lands within the protected corridor of the Proposed Segment.

14.     The declaratory and injunctive relief requested by plaintiffs will redress that harm by declaring that the Proposed Segment is ineligible for inclusion in the WSR System and by removing it from protective management. The Army Corps would not be prohibited from issuing a permit and OCAPA members could secure authorization under Section 404 for streambank stabilization necessary to protect historical mining sites from erosion, channel migration, and channel capture of excavated gravel ponds. In addition, public lands would remain open to salable mineral material disposal, and private landowners could seek operating permits to conduct surface mining, free of opposition from BLM based on the Proposed Segment's status as a segment suitable for designation.

15.     Plaintiffs have no other plain, speedy, or adequate remedy at law. The decision of BLM and the Secretary, in the 2016 RMPs, to deem the Proposed Segment suitable for designation under the WSR Act, and thus to proceed with designation, is a final agency decision and is ripe for judicial review. The decision to elevate the Proposed Segment from "eligible" to "suitable" is the "consummation" of the agency's decision making process. *Bennett v. Spear*, 520 U.S. 154, 177 (1997). That is, the 2016 RMPs represent the culmination of the *agency* process; the final step of formal designation "belongs to Congress." *Center for Biological Diversity v. Veneman*, 335 F.3d 849, 853 (9th Cir. 2003). The Proposed Segment is currently managed to protect its "free-flowing values" in anticipation of its inclusion in the WSR System, so delaying review until formal designation will increase the likelihood of harm to plaintiffs without developing or clarifying the defendants' decision in any way.

Page 6 – **COMPLAINT**

**Defendants**

16.     Defendant Kristin Bail, Acting Director of BLM, is responsible for issuing the 2016 RMPs. Defendant Kevin "Jack" Haugrud, Acting Secretary of the Interior, is the official charged with administering the WSR Act through BLM.

## BACKGROUND ALLEGATIONS

17.     From its headwaters in the Cascade Mountains, the Rogue River runs 215 miles to the Pacific Ocean. Its lower segment, from the confluence of the Applegate River at river mile ("RM") 95 downstream to Lobster Creek Bridge at RM 11, was one of the original rivers designated in the WSR Act in 1968. 16 U.S.C. §§ 1271 to 1287. Its upper segment, from the headwaters downstream to the national forest boundary near Prospect, Oregon, is located within Crater Lake National Park and the Rogue River National Forest. That segment was added to the WSR Act in 1988. Both upper and lower segments are also protected under the Oregon Scenic Waterways Act, ORS 390.805 to 390.925.

18.     The WSR Act was enacted in 1968 to establish a system of federal protection for particular rivers and river segments that remained in a natural, "free-flowing" state. The Act's purpose was to create a balance between preservation and development, to counter the "national policy" of dam development with a competing policy that would preserve "certain selected rivers." WSR Act Section 1, 16 U.S.C. § 1271. To be eligible for inclusion in the program, a river must be a "free-flowing stream." Section 2, 16 U.S.C. § 1273(b).

19.     Rivers are added to the WSR System through congressional action following a study under Section 5 of the WSR Act, 16 U.S.C. § 1276. Under Section 5(a), specific rivers are listed for study and potential inclusion in the WSR System. Under Section 5(d)(1), federal agencies are directed to consider the eligibility and suitability of additional rivers as part of their planning processes. 16 U.S.C. § 1276(d)(1); *see also* Interagency Wild and Scenic Rivers

Page 7 – **COMPLAINT**

Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 327
Portland, Oregon 97219
Telephone:  (503) 768-8500
Fax:  (503) 222-3255

Coordinating Council, "The Wild & Scenic River Study Process" (Dec. 1999) ("*Interagency Report*").

20.     The first step in a Section 5(d)(1) analysis is a determination of <u>eligibility</u>: A river is eligible if it "is free-flowing and possesses one or more outstandingly remarkable values (ORVs)." *Interagency Report* at 2. BLM adopted RMPs in 1995, and in that planning process found 51 river segments eligible for inclusion in the WSR program, including the Rogue River Proposed Segment. *See* 1995 Medford District RMP.

21.     The Proposed Segment has been protectively managed since it was determined eligible for designation. *See Suitability Report* at 3-4. Protective management of a Section (5)(d)(1) river segment is not statutory, as it is for a Section 5(a) segment, but the BLM has broad authority to restrict activities—on both public and private land—along the stream corridor within the Proposed Segment. *BLM Manual* § 3-8. The stream corridor includes one-quarter mile of upland on each side of the river. Thus the BLM has authority to follow the management objectives in the 2016 RMPs, including the direction to "[p]rotect and enhance the free-flowing condition, water quality, and outstandingly remarkable values of eligible, suitable, and designated Wild and Scenic River corridors." 2016 Southwestern Oregon RMP at 53.

22.     Throughout the Proposed Segment, streambanks have been extensively modified, armored, and engineered to stabilize the river channel. Lost Creek Dam regulates the river's flow and functions as a flood control impoundment. Despite this, the Proposed Segment is subject to extreme flooding, erosion, and avulsive channel movement. To protect against loss of upland property, and to prevent environmental degradation, affected owners, organizations, and agencies have modified the river channel and banks extensively—through rip-rapping; backfilling, grading, and re-contouring; and installation of flow training structures known as "stream barbs" and "bendway weirs."

Page 8 – **COMPLAINT**

23.     Several miles of the Rogue River shoreline within the Proposed Segment are zoned "Aggregate Resource" and are or have been utilized for sand and gravel extraction. The river channel and riparian areas are significantly modified in these areas. A short distance upstream from the confluence of the Rogue and Applegate Rivers, on the south bank of the river, a United States Army Corps of Engineers levee separates the main channel from ponds left behind from gravel mining operations. In 2004, to prevent an avulsive "capture" of these ponds, Copeland Sand and Gravel obtained a permit from the Oregon Department of State Lands ("DSL") to raise portions of the levee, create a designed spillway, and place 6,625 cubic yards of rip-rap to shore up degraded portions of the levee. *See* DSL Permit No. 31290-RF (issued March 16, 2004). Accordingly, this portion of the Proposed Segment does not comport with the WSR Act's definition of "free-flowing," the minimum requirement for eligibility.

24.     Another aggregate mining area is located in a three-mile reach from RM 126.5 to 129.5, where mining operations created a series of excavated gravel pits and ponds along the shoreline. The Oregon Department of Transportation ("ODOT") excavated one such pond on the south bank of the river, leaving a 150-foot buffer, or "leave strip," between the excavation and the Rogue River channel. In the New Year's Day Storm of 1997, the river breached the leave strip and entered the pond, resulting in a permanent channel capture of the ODOT gravel pit. *See* Oregon Department of Geology and Mineral Industries, *Open-File Report O-04-14, OWEB Grant 203-029, Rogue River Stakeholder Project Phase 2: Completion Report and Year One Monitoring Report* (2004) ("*DOGAMI Phase 2 Report*"). Ten other ponds in the three-mile reach were also at risk of being captured.

25.     The Rogue River Stakeholders Group, a consortium of landowners, government agencies, mining industry representatives, and environmental groups, formed to address the problem created by capture of the ODOT gravel pit. The Stakeholders Group worked with a geomorphologist to design an extensive, three-phase project to prevent further channel captures

Page 9 – **COMPLAINT**

Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 327
Portland, Oregon 97219
Telephone:  (503) 768-8500
Fax:  (503) 222-3255

in the three-mile reach. The project affected 12,500 feet of river bank. It involved placement of 10,000 cubic yards of gravel backfill in the captured pond; a toe slope protection structure and channel outfall requiring 13,650 cubic yards of angular quarry rock, gravel, sand, and soil; removal of an artificial island; and installation of eight stream barbs and six bendway weirs. *See* DSL Permit No. 24977-RF (issued July 9, 2003). The stream barbs were constructed of angular rock, each structure extending 20 feet into the river channel. The bendway weirs, also constructed of rock, extend 40 to 50 feet into the captured ODOT pond. *See* Rogue River Stakeholders Group, *Phase 3 Project Completion Report, OWEB Project No. 204-098* (February 2007) ("*DOGAMI Phase 3 Report*"). The floodplain management project at RM 126.5 to 129.5 illustrates that this three-mile reach has been extensively modified to prevent pit captures and resulting ecological harm. Under Sections 2 and 16 of the WSR Act, it is not a "free-flowing stream" and is not eligible for designation.

26.     Pit captures cause extreme damage to salmon habitat and to a river's overall ecology. Before the project was completed, an estimated 95,000 tons of sediment entered the river every year as a consequence of the captured ODOT pit. *See* DSL Permit No. 24977-RF. Additional pit captures would be catastrophic. According to DOGAMI, "Allowing the river to capture any of these other ponds would have resulted in tremendous downstream sediment loads, environmental degradation, and ultimately, the dewatering of several miles of mainstem and side-channel habitat." *DOGAMI Phase 2 Report* at 2.

27.     Section 7 of the WSR Act, 16 U.S.C. § 1278(a), provides that "no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established. . . ." A "water resource project" includes "watershed restoration/enhancement projects," "bank stabilization projects," and "activities that require a 404 permit from the [Army Corps]." *See* Interagency Wild and Scenic Rivers Coordinating

Page 10 – **COMPLAINT**

Council, *Wild & Scenic Rivers Act: Section 7* at 3 (2004) ("*Section 7 Interagency Report*").

Under Section 7, the U.S. Army Corps of Engineers would almost certainly deny a Section 404

permit application for bank stabilization activities. *See Section 7 Interagency Report* at 3, 11, 15.

Thus designation of the Proposed Segment would effectively halt future bank and channel

protection activities. That could result in further pit captures, severely degrading downstream

fish habitat and frustrating the very purposes and policies the WSR Act was created to protect.

28.     The river valley along the Proposed Segment is occupied by small to mid-sized

municipalities, agricultural lands, and residential property. The river channel is migratory

throughout the Proposed Segment. Thus as the valley grows more densely populated, and as real

estate prices rise, stabilization of the river channel becomes more critical for public safety as well

as economic reasons. The streambanks in the Proposed Segment have been rip-rapped, reshaped,

revegetated, and engineered to protect private and municipal property and to ensure public

safety. These modifications expressly exclude the river from WSR Act designation. The

Proposed Segment is not "free-flowing" and is ineligible for inclusion in the WSR program.

29.     At RM 132, the property owner revegetated 10,000 square feet of eroded

streambank and installed ten stream barbs, each 25 feet long, at intervals of 25 feet. The barbs

were needed to redirect the current's velocity away from a 1,325-foot length of the bank that had

been eroded by flooding. At risk, without the project, were the landowner's property and

possible incursion of the river channel into a 35-acre lake. *See* DSL Permit No. 13431 (issued

July 14, 1998).

30.     From RM 137 to 138, the channel has a history of avulsive movement. In 2006,

the property owner installed 500 feet of rip-rap as protection from severe undercutting during the

winter of 2005–2006. In 2009, the owner reconstructed 345 feet of the rip-rapping to incorporate

root wads, create a "planting bench" above the ordinary high water line, and vegetate the riparian

area with trees and shrubs. *See* DSL Permit No. 42319-GA (issued May 20, 2009).

Page 11 – **COMPLAINT**

31.     From RM 140 to 142, a portion of the Double R Ranch has been subject to channel migration and property loss through erosion. In the 1950s, the property owner constructed a levee to prevent avulsive channel movement. In the 1970s, the owner armored the main channel with a 300-foot rip-rap revetment. In 2008, downstream of the revetment, the owner reshaped the river's east bank to accommodate revegetation, and installed six bendway weirs and 45 additional feet of rip-rapping. *See* DSL Permit No. 36930-RF (issued July 21, 2008).

32.     At RM 152, Jackson County operates a public boat ramp at Rogue Elk Park. The river current scours the sediments from the toe of the ramp, creating a drop-off that makes the ramp unsafe and causes damage to boat trailers. Jackson County reinforces the scour area annually by placing five cubic yards of rock at the end of the ramp. *See* DSL Application No. 23905-GA (NSP letter issued May 9, 2001).

33.     Under the express terms of the WSR Act, the Proposed Segment is not eligible for inclusion in the WSR program because it is not free-flowing. "Free-flowing" is defined in the Act, Section 16, 16 U.S.C. § 1286(b), as follows: "'Free-flowing,' as applied to any river or section of a river, means existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway." The definition goes on to clarify that "low dams, diversion works, and other minor structures" do not automatically disqualify a river from eligibility. However, while the statutory terms "impoundment" and "diversion" are qualified to allow these types of "minor structures," there is no *de minimus* exception for "straightening, rip-rapping, or other modification" of a river. To the contrary, the Act is unambiguous: Any amount of streambank canalization, armoring, or "other modification" makes a waterway ineligible under the WSR Act.

34.     Thousands of feet of the river bank in the Proposed Segment have been armored with rip-rapping. Under WSR Act Section 16, a rip-rapped streambank takes the river outside the

Page 12 – **COMPLAINT**

definition of "free-flowing." 16 U.S.C. § 1286(b). Although any amount of rip-rapping would disqualify a waterway from eligibility, within the Proposed Segment rip-rapping is extensive. This alone makes the segment ineligible for designation, by the express terms of the WSR Act.

35.     Many river bends in the proposed segment have been fitted with channel-training devices known as "bendway weirs" and "stream barbs." Bendway weirs are rock sills built into the outside bend of a stream, angled against the current. They reduce erosion on the outside of a bend by redirecting flow velocities toward the stream's center. *See* United States Army Corps of Engineers, "Bendway Weirs," *available at* chl.erdc.usace.army.mil/chl.aspx?p= s&a=RD_APPLICATIONS;2. For purposes of statutory interpretation, bendway weirs are both a "modification" and the equivalent of "rip-rapping." Like rip-rap, they are used to prevent loss of upland. Instead of armoring the bank, however, they prevent erosion by modifying the morphology of a river channel. Bendway weirs were invented in 1988 by an Army Corps engineer. Had they existed when the WSR Act was enacted, 20 years before, they would have fit clearly within the intent of Sections 2 and 16. A river whose channel has been modified by bendway weirs or stream barbs is not "free-flowing."

36.     The Proposed Segment continues to remain vulnerable to flooding, erosion, and avulsive channel movement. The streambanks and scour areas within the Proposed Segment will require ongoing stabilization and reinforcement in the future. Following designation, WSR Act Section 7 will prevent the Army Corps from issuing a permit under Clean Water Act Section 404, a requirement of most or all such activities. *See Section 7 Interagency Report* at 3, 11, 15. Designation of the Proposed Segment would effectively halt further bank and channel protection activities, resulting in property loss, ecological harm, and risks to public safety. Designation would undermine rather than promote the preservation and conservation policies of the WSR Act. 16 U.S.C. § 1271.

Page 13 – **COMPLAINT**

37.     The second step in a Section 5(d)(1) analysis is an evaluation of <u>suitability</u>, the

final agency step before designation. BLM's guidance document, "BLM Manual 6400," provides

criteria for evaluating suitability. *See BLM Manual* § 3-4. In April 2007, BLM released the

*Suitability Report*. The focus of the "suitability phase" is to determine "whether eligible

segments would be appropriate additions to the [National WSR System] by considering tradeoffs

between corridor development and river protection." *Suitability Report* at 5. The report

concluded that the Proposed Segment was suitable for WSR designation from Lost Creek Dam at

RM 157.5 downstream to the confluence of the Rogue with the Applegate River at RM 95.

*Suitability Report* at 121-139.

38.     In the planning process that culminated in issuance of the 2016 RMPs, BLM

released its Draft Resource Management Plan and Environmental Impact Statement on April 24,

2015. The Draft RMP/EIS adopted the recommendation from the *Suitability Report* and elevated

the Proposed Segment from "eligible" to "suitable."

39.     The *BLM Manual* sets forth the required analysis to determine suitability. *BLM*

*Manual* § 3.4. The *Manual* identifies four questions for the agency to answer in evaluating "the

benefits and impacts of WSR designation," as well as thirteen factors to be considered in

determining suitability. *See id*. Under a correct evaluation of suitability, the Proposed Segment

does not meet the criteria in the *BLM Manual*.

40.     The *BLM Manual* indicates that agencies should address four questions as a

starting point for an evaluation of suitability. The BLM does not ask or answer these questions in

the *Suitability Report*, the Draft RMP/EIS, or the PRMP/FEIS.

41.     Section 3.4 of the *BLM Manual* requires the BLM to consider "Question 1,"

which states: "Should the river's free-flowing condition, water quality, and outstandingly

remarkable values be protected, or are one or more other uses important enough to warrant doing

otherwise?" As discussed above, the Proposed Segment does not exist in a "free-flowing

Page 14 – **COMPLAINT**

Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 327
Portland, Oregon 97219
Telephone:  (503) 768-8500
Fax:  (503) 222-3255

condition." Even if it did, however, "other uses" in the Rogue River valley must take precedence over protection under the WSR Act. Specifically, municipal and agricultural uses are firmly established along the Proposed Segment, are incompatible with the WSR program, and should take precedence over designation.

42.     The Proposed Segment flows through the City of Grants Pass, one of the two largest population centers in southern Oregon. The Segment also flows past several smaller cities, characterized by urban, commercial, small industrial, and residential development. Several cities—Grants Pass, Rogue River, Gold Hill, and Shady Cove—discharge treated wastewater in compliance with the National Pollution Discharge Elimination System program. The cities' ability to change or renew those permits; maintain or build urban infrastructure, such as bridges; or divert water for municipal uses would all be affected by WSR Act designation.

43.     Urban areas along the Proposed Segment are surrounded by farms and ranches, with much of the land zoned for Exclusive Farm Use. The Rogue River valley is one of Oregon's most productive agricultural areas, used for livestock, agricultural produce (such as pears), vineyards, and specialty crops such as cut flowers, herbs, and organic fruit and vegetables. Production depends on the availability of water for irrigation—including irrigation diversions from the Rogue River. Water rights transfers, new diversions, and even repair or replacement of existing diversions could all be stymied by designation under the WSR Act.

44.     The *BLM Manual* also requires the BLM to consider "Question 2," which states: "Will the river's free-flowing condition, water quality, and outstandingly remarkable values be protected through designation?" Assuming the Segment were "free-flowing," which it is not, the "outstandingly remarkable values" of fisheries and recreational use would not be protected by WSR designation. To the contrary, designation would impose a heavy overlay of federal regulation on a portion of the Rogue River that would not benefit from its protection. For example, the WSR Act restricts federal agencies' ability to authorize activities that may be

Page 15 – **COMPLAINT**

inconsistent with the values protected by the Act. Thus the Army Corps would view designation

as prohibiting issuance of a permit to authorize discharges into waters of the United States under

Section 404 of the Clean Water Act. *See* WSR Act Section 7, 16 U.S.C. § 1278(a).

45.     Channel modification will be necessary in the future to prevent channel capture of

gravel pits located within the river's floodplain, and to protect private and municipal property.

Because such activities normally require a Section 404 permit from the Corps, designation would

block the federal authorizations necessary for future streambank stabilization—to the detriment

of the resource, including the "outstandingly remarkable values" of fishing and recreation.

46.     The *BLM Manual* requires the BLM to consider Question 3, "Is designation the

best method for protecting the river corridor?" and Question 4, "Is there a demonstrated

commitment to protect the river by any non-Federal entities that may be partially responsible for

implementing protective management?" Designation is not the best method for protection of the

resource and recreational values of the Proposed Segment. Local municipalities have rights to

use the river and its water, and a direct interest in protecting the resource. Other governmental

entities and agencies are specifically committed to protective management, and they are more

capable of providing that management. As the *Suitability Report* points out, the Jackson County

Parks Department and the Oregon Department of Fish and Wildlife are actively planning and

developing "a strategy to manage the recreational use while maintaining the integrity of the

natural resources in the area." *Suitability Report* at 122. Designation would duplicate local

management and could easily undermine it.

47.     The *Suitability Report* concedes that the WSR program would be duplicative and

unnecessary to protect the Segment's "outstandingly remarkable values." For example, the

*Report* states that, given existing law and management, neither recreation, nor "scenic and

wildlife values" would be "diminished or foreclosed if the segment was not designated." *Id*. at

128.  Instead, according to the *Report*: "If the river were not added to the National Wild and

Page 16 – **COMPLAINT**

Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 327
Portland, Oregon 97219
Telephone: (503) 768-8500
Fax: (503) 222-3255

Scenic Rivers System, BLM and other government entities would continue to manage and protect lands under their jurisdiction for the natural resource and historical values along the river corridor. The Outstandingly Remarkable Values would not be diminished or lost by such management." *Id*. Other examples include the *Report*'s statement that "fish and wildlife values" are already protected "by special management practices pursuant to other federal statutes," *id*. at 129; and that compliance with water quality standards will be unaffected by designation, *id*. at 131. In its discussion of Criteria 7, the *Report* summarizes the duplicative effect of designation: "If the river were not added to the National Wild and Scenic Rivers System, Federal, State, and local land management agencies could continue to protect land under their jurisdiction for the riparian values and Outstandingly Remarkable Values along the river area under existing laws, authorities, and ordinances. Public lands outside the riparian zone would be subject to existing laws, regulations and timber management prescriptions, excluding protective wildlife areas. For example, Oregon water laws and appropriative water right procedures administered by the Oregon Water Resources Department ("OWRD") would continue oversight of water use for domestic and agricultural purposes including rural residential use, forestry, agricultural use and irrigation." *Id*. at 129.

48.  In addition, BLM's small percentage of land ownership in the proposed segment would make meaningful federal management impossible; even with land acquisition, "it would be difficult for the BLM to acquire enough additional land to affect the manageability of the segment." *Id*. at 129. For that reason, the *Report* recommends that the State of Oregon administer the WSR program for the proposed segment—and in fact names Oregon as the "*Federal* agency . . . most suited to manage the land and resources within this boundary." *Id*. at 128 (emphasis added).

49.  The *BLM Manual* requires the agency to consider thirteen factors as the basis for a suitability determination. *BLM Manual* § 3.4. Factor No. 1 requires the agency to document the

Page 17 – **COMPLAINT**

Proposed Segment's "characteristics that do, or do not, make the area a worthy addition to the National System"—including the two primary characteristics for eligibility, "free flow and outstandingly remarkable values." *Id.* § 3.4. The Proposed Segment does not fall within the statutory definition of "free-flowing," but the *Suitability Report* fails to mention that characteristic at all, except to say that "dam removal has made the river free-flowing." *Suitability Report* at 123. However, impoundments are not the only structures in the statutory definition of "free-flowing" that disqualify a river from designation. Indeed, the Secretary of Interior has applied Section 7 of the WSR Act to *any* project that "would result in any change in the free-flowing characteristics" of a designated river, including projects that "involve construction activity in the bed or on the banks." *Sierra Club North Star Chapter v. Pena*, 1 F. Supp. 2d 971, 979 (1998). The proposed segment is not "free-flowing," and thus under Factor No. 1 it is unsuitable as a "worthy addition" to the WSR program.

50.     Factor No. 2 requires the agency to evaluate the "current status of land ownership and use in the area." Factor No. 3 requires the agency to identify "reasonably foreseeable potential uses of the land and water that would be enhanced, foreclosed, or curtailed" by designation. *BLM Manual* § 3.4. The BLM's own findings under Factor Nos. 2 and 3 demonstrate that current land use in the Proposed Segment is wholly inconsistent with the WSR program.

51.     Most of the property within the Proposed Segment—85.9 percent—is privately owned. *Suitability Report* at 124. The *Report* identifies the status of ownership and land use, but does not meaningfully evaluate that status in terms of suitability. The extent of private land ownership makes the Proposed Segment unsuitable for several reasons. First, designation would limit private property rights: The *Report* states that designation "could affect private land use and development," in a variety of ways. *Suitability Report* at 128. Second, the status of public and private ownership is currently in dispute; several property owners, including the Double R

Page 18 – **COMPLAINT**

Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 327
Portland, Oregon 97219
Telephone:  (503) 768-8500
Fax:  (503) 222-3255

Ranch, have been litigating the issue of state ownership of the river, based on navigability for title, since 2008. Currently, because the state's declaration of ownership is legally insufficient, the land in question remains in private ownership. However, the state will likely pursue its claim to the 1859 river channel. Until that issue is resolved, the true extent of public and private land cannot be determined. Third, only two miles of the river segment are adjacent to federal land. *Suitability Report* at 121. Without acquiring additional land through eminent domain, neither BLM nor the Forest Service has a sufficient presence along the Segment to allow effective management.

52.     Although the *Suitability Report* identifies major land uses within the Proposed Segment, it makes no effort to assess the compatibility of those uses with a WSR designation. For example, the report identifies mining, a "considerable interest in mineral exploration," and a "large number of mining claims on file" in the Proposed Segment, *Suitability Report* at 125, but says only that new mining claims "could be patented only as to the mineral estate," *id*. at 128. The *Report* fails to account for the inconsistency of a WSR designation with the area's history and ongoing public interest in mineral development. Under Section 9 of the WSR Act, minerals on federal lands within a designated river are withdrawn from appropriation under the mining laws and all mineral exploration is subject to regulation to "effectuate the purposes" of the Act. 16 U.S.C. § 1280. As a second example, the *Suitability Report* mentions the prevalence of "dredging activity" between the former Gold Ray Dam site and the town of Gold Hill, *Suitability Report* at 125, and states that "dredging activities may be limited or prohibited with designation, *id*. at 128. However, the *Report* contains no analysis of the environmental, public safety, or economic impacts of such prohibition on further dredging. As a third example, the *Suitability Report* identifies that "approximately 1,000 water rights and 1,233 points of diversion" exist within the Proposed Segment, *Suitability Report* at 124; that agriculture, municipal and domestic use, and livestock rearing are major land uses in the Segment, *id*. at 125; and that designation

Page 19 – **COMPLAINT**

Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 327
Portland, Oregon 97219
Telephone:  (503) 768-8500
Fax:  (503) 222-3255

may limit both current and future water rights, *id*. at 127. However, the *Report* makes no attempt to reconcile water use curtailments with the ongoing need for water necessary to support the current land uses that dominate the Segment.

53.     Factor No. 10 requires the agency to evaluate the "existing support or opposition of designation." *BLM Manual* § 3.4. Designation of the Proposed Segment does not have broad local support, as evidenced by the comments of Plaintiff Double R Ranch Trust; the separate comments of the Jackson County Board of Commissioners, *see* Letter from Doug Breidenthal, Chair, Jackson County Board of Commissioners, to Jerome Perez, State Director, Bureau of Land Management (July 15, 2015); and the supplemental comments filed in April 2016 by Plaintiff OCA, Plaintiff OCAPA, and six other trade associations, as well as Jackson County, Plaintiff Double R Ranch, one Oregon corporation, and five individual ranchers and other property owners.

54.     Factor No. 12, the "contribution to river system or basin integrity," supports a whole-river approach, creating a bias in favor of closing the gaps in a partially designated river. *BLM Manual* § 3-7. The policy behind this twelfth factor is inconsistent with the segment-based approach in the WSR Act. *See, e.g.*, WSR Act Section 3, 16 U.S.C. § 1274.

55.     In addition, discussion of this factor in the *Suitability Report* masks the dramatic differences between the Proposed Segment and other areas of the Rogue River. The Proposed Segment differs in land ownership, land use, and terrain—in ways that make it unsuitable for inclusion in the program. For example, the already-designated upper segment of the Rogue River is located entirely within two national forests. The already-designated lower segment flows through predominately Forest Service and BLM land, according to BLM's *Rogue River Float Guide.* Bureau of Land Management, United States Forest Service, *Rogue River Float Guide* at 4 (2004), *available at* http://www.blm.gov/or/resources/recreation/rogue/files/FloatGuide04.pdf

Page 20 – **COMPLAINT**

Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 327
Portland, Oregon 97219
Telephone:  (503) 768-8500
Fax:  (503) 222-3255

("*Float Guide*"). In contrast, the Proposed Segment comprises almost entirely private property, with insignificant land ownership by federal agencies.

56.     The landscape of the Proposed Segment contrasts markedly with that of the upper and lower segments, not only because of human development, but as a result of the area's geology. In the upper segment, the river flows from its headwaters to cut through the Cascade Mountains in steep-walled canyons, at a gradient of about 57 feet per mile. *See Hardy v. State Land Board*, 274 Or. App. 262, 275 (2015). After Lost Creek Reservoir, the river flows through the town of Shady Cove at RM 146 and traverses the Rogue River valley at a much gentler gradient of 7.5 feet per mile, as it meanders across a "generally flat valley floor." *Id*. BLM's *Float Guide* describes the transition as follows: "Rushing from the Cascade Range, the river glides into the Rogue Valley floor, drifting peacefully past cities and towns and agricultural lands." *Float Guide* at 1. Shortly after its confluence with the Applegate River at RM 95, where the lower segment begins, the Rogue River enters Hellgate Canyon and again becomes confined to steep, narrow canyons in the Klamath Mountains.

57.     Because it flows through a broad, alluvial plain, the Proposed Segment of the Rogue River is subject to extreme high-water events and channel movement. At the same time, the area is highly populated and heavily developed by private, municipal, and corporate owners. In particular, bank and channel stabilization projects are common in this area and, as discussed above, will be needed in the future.

58.     The ownership, land use, and terrain of the Proposed Segment are in absolute contrast to the already-designated reaches of the Rogue River. Unlike the upper and lower reaches, the Proposed Segment is not "free-flowing." The WSR Act was intended to protect specific *segments* of rivers. The Proposed Segment is neither eligible nor suitable for designation, and the BLM's whole-river approach is both inconsistent with the WSR Act and wholly inadequate to support a recommendation of WSR designation.

Page 21 – **COMPLAINT**

59.     On August 21, 2015, Plaintiff Double R Ranch Trust submitted comments on the

Draft RMP/EIS during the public comment period, expressing the Ranch's opposition to BLM's

identification of the Proposed Segment as suitable for inclusion in the WSR program. On April

6, 2016, the Ranch, Plaintiff OCA, Plaintiff OCAPA, and 12 other commenters submitted

supplemental comments concerned specifically with the potential designation of the Rogue River

under the WSR Act.

60.     Without responding to the comments, BLM issued the Western Oregon Proposed

Resource Management Plan and Final Environmental Impact Statement ("PRMP/FEIS") on

April 12, 2016, and published a Notice of Availability in the Federal Register on April 15, 2016.

81 Fed. Reg. 22305.

61.     Plaintiff Double R Ranch filed a protest of the PRMP/FEIS on May 14, 2016,

under BLM regulations. *See* 43 C.F.R. § 1610.5-2. BLM denied the protest, and all other protests

concerning the PRMP/FEIS, on August 5, 2016. *See* Director's Protest Resolution Report (Aug.

5, 2016).

62.     Without revising its recommendation that the Proposed Segment be recommended

for designation, BLM issued two records of decision on August 5, 2016 that adopted the 2016

RMPs for the Western Oregon Districts, including the Medford District where the Proposed

Segment is located.

63.     BLM's conclusion that the Proposed Segment is eligible for designation is

contrary to the express terms of the WSR Act and specifically to the definition of "free-flowing"

in Section 16. 16 U.S.C. § 1286(b).

64.     BLM's conclusion that the Proposed Segment is suitable for designation is

contrary to the express terms of both the WSR Act and the *BLM Manual*.

65.     The Administrative Procedure Act ("APA") authorizes courts reviewing agency

action to hold unlawful and set aside final agency actions, findings, and conclusions that are

Page 22 – **COMPLAINT**

Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 327
Portland, Oregon 97219
Telephone:  (503) 768-8500
Fax:  (503) 222-3255

arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5

U.S.C. § 706(2)(A). RMPs are reviewed under this provision of the APA.

## FIRST CLAIM FOR RELIEF

### The 2016 RMPs Violate the WSR Act and the APA by Concluding that the Proposed Segment Is a "Free-Flowing Stream" and Thus Eligible for Designation Under the Act

66.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

67.     To be eligible for designation under the WSR Act, a river must be a "free-flowing

stream"—that is, "existing or flowing in natural condition without impoundment, diversion,

straightening, rip-rapping, or other modification." 16 U.S.C. §§ 1273(b), 1286(b). Although "low

dams, diversion works, and other minor structures" do not automatically disqualify a river from

eligibility, the WSR Act provides no *de minimus* exception for "straightening, rip-rapping, or

other modification" of a river. *Any* amount of streambank canalization, armoring, or "other

modification" makes a waterway ineligible under the WSR Act.

68.     All of these activities have been used in the Proposed Segment to modify and

stabilize the river channel: Straightening, rip-rapping, and other modifications are common

occurrences throughout the Segment. These modifications expressly exclude the river from WSR

Act eligibility. Accordingly, BLM's decision, in the 2016 RMPs, to continue to treat and manage

the Proposed Segment as an eligible river violates the WSR Act. In addition, the decision is

arbitrary and capricious, an abuse of discretion, and contrary to law in violation of the APA, 5

U.S.C. §§ 701–706.

## SECOND CLAIM FOR RELIEF

### The 2016 RMPs Violate the WSR Act and the APA by Concluding that the Proposed Segment Is Suitable for Designation Under the Act

69.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

70.     The Proposed Segment is not *eligible* for designation under the WSR Act; it

necessarily follows that the Proposed Segment cannot be *suitable* for designation, as eligibility is

Page 23 – **COMPLAINT**

a prerequisite to a determination of suitability. *See Southern Utah Wilderness Alliance v. Burke*, 981 F. Supp. 2d 1099, 1114-1115 (D. Utah 2013).

71.     The *BLM Manual* sets forth the analysis required to determine suitability. *See BLM Manual* § 3.4. The *Manual* identifies four questions for the agency to answer in evaluating "the benefits and impacts of WSR designation" as well as thirteen factors to be considered in determining suitability. *See id*. The *Suitability Report* fails to ask or answer the preliminary four questions required by the *Manual*. The *Report*'s assessment of the thirteen factors is flawed. Under a correct evaluation of suitability, the proposed segment does not meet the criteria in the *BLM Manual*, which provides the agency with guidelines to implement the WSR Act. Accordingly, BLM's decision, in the 2016 RMPs, to deem the Proposed Segment suitable for designation violates the WSR Act. In addition, the decision is arbitrary and capricious, an abuse of discretion, and contrary to law in violation of the APA, 5 U.S.C. §§ 701–706.

### THIRD CLAIM FOR RELIEF

**The 2016 RMPs Violate the WSR Act and the APA by Deeming the Proposed Segment Appropriate for Protective Management and Determining That the Segment Will Continue to Be Protectively Managed Pending Designation Under the Act**

72.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

73.     The Proposed Segment is neither eligible nor suitable for inclusion in the WSR System, as discussed above. Accordingly, BLM's decision, in the 2016 RMPs, to continue to manage the Proposed Segment as an eligible river violates the WSR Act; the decision is also arbitrary and capricious, an abuse of discretion, and contrary to law in violation of the APA, 5 U.S.C. §§ 701–706.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Adjudge and declare that the Secretary and the BLM have violated the WSR Act by determining that the Proposed Segment is eligible for designation and continuing to treat and

Page 24 – **COMPLAINT**

manage the Segment as an eligible waterway, and that the 2016 RMPs are therefore arbitrary, capricious, an abuse of discretion, and contrary to law;

B.      Adjudge and declare that the Secretary and the BLM have violated the WSR Act and the guidelines in the *BLM Manual* by determining that the Proposed Segment is suitable for designation, and that the 2016 RMPs are therefore arbitrary, capricious, an abuse of discretion, and contrary to law;

C.      Adjudge and declare that the Secretary and the BLM have violated the WSR Act and the guidelines in the *BLM Manual* by managing the Proposed Segment protectively pending designation under the WSR Act, and that the 2016 RMPs are therefore arbitrary, capricious, an abuse of discretion, and contrary to law;

D.      Vacate and remand the 2016 RMPs with instructions to prepare RMPs that comply with the requirements of the WSR Act;

E.      Award Plaintiffs their reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F.      Grant Plaintiffs such further relief as may be just, proper, and equitable.


Dated:  February 27, 2017

Respectfully submitted,

s/ Caroline Lobdell_____
CAROLINE LOBDELL
D.C. Bar No. 1028428
Western Resources Legal Center
9220 SW Barbur Blvd., Ste. 327
Portland, OR 97219
Telephone: (503) 768-8500
Email: clobdell@wrlegal.org

s/ Jennie L. Bricker_____
JENNIE L. BRICKER
OSB No. 975240

Page 25 – **COMPLAINT**

Jennie Bricker Land & Water Law
818 SW Third Avenue, No. 1517
Portland, OR 97204
Telephone: (503) 928-0976
Email: jennie@jbrickerlaw.com

Page 26 – **COMPLAINT**